# In re Dyarman

250

C.P. of Cumberland County, no. 01-0684 Civil Term.

*Robert L. O'Brien,* for petitioner.

*Robert J. Mulderig,* for respondent in mental health proceeding.

*John A. Abom,* for respondent in guardianship proceeding.

BEFORE: HOFFER, *P.J.,* BAYLEY AND OLER, *JJ.*

OLER, *J.,* February 12, 2001—These cases, filed under the Mental Health Procedures Act and the guardianship provisions of the Probate, Estates and Fiduciaries Code, involve a woman named Cheryl I. Dyarman

who has become a quadriplegic as the result of an irreversible and progressive illness known as demyelinating disease. The object of the petitions presented to the court was to subject Ms. Dyarman involuntarily to electroconvulsive (*i.e.,* electroshock) treatments for depression.

The petitioner under the Mental Health Procedures Act was Robert L. O'Brien, Esq., solicitor for the Cumberland/Perry Mental Health and Mental Retardation Unit.[1] Attorney O'Brien also represented the petitioner, under the Probate, Estates and Fiduciaries Code, Kathy Myers.[2] The court appointed Robert J. Mulderig, Esq., to represent Ms. Dyarman in the mental health proceeding, and John A. Abom, Esq., to represent Ms. Dyarman in the guardianship proceeding.

A hearing on the petition under the Mental Health Procedures Act for involuntary treatment and on the petition under the Probate, Estates and Fiduciaries Code for appointment of an emergency guardian to authorize electroconvulsive therapy was held on Wednesday, January 24, 2001, and Monday, January 29, 2001, by the undersigned judge. Following the hearing, the court entered an order in the Mental Health Procedures Act case

---

1. Because of the exigent circumstances of the filing, the court did not inquire into the technicality of whether the petitioner under the Mental Health Procedures Act was a "responsible party" qualified to seek the relief requested. See Act of July 9, 1976, P.L. 817, §304(c)(1), as amended, 50 P.S. §7304(c)(1) (2000 Supp.).

2. Ms. Myers was an employee of the Cumberland County Nursing Home, where Ms. Dyarman has lived since 1987. The proposed guardian, Gloria A. Anderson, had been a friend of Ms. Dyarman's mother and was Ms. Dyarman's attorney-in-fact pursuant to a power of attorney.

declining to commit Ms. Dyarman to a mental institution for involuntary treatment, and entered the following limited order in the guardianship case:

"And now, February 2, 2001, upon consideration of the petition for appointment of an emergency guardian for Cheryl I. Dyarman, an allegedly incompetent person, and following a hearing held on January 24, 2001 and January 29, 2001, and it appearing that the allegedly incapacitated person has been suffering for many years from a debilitating and progressive physical illness known as demyelinating disease, which has reached the state of [q]uadriplegia, that it is difficult for her to communicate as a result of the illness, and that she executed a living will in 1995 authorizing hospitalization, intravenous therapy (including administration of nutrients, fluids and medication by vein), antibiotics, and pain medications, but prohibiting artificial nutrition by means of tube in the veins, nose or stomach, cardiopulmonary resuscitation, intubation and mechanical breathing, kidney dialysis, and chemotherapy to fight cancer . . . , and the court finding that her ability to fully communicate decisions related to her physical health and safety has been impaired by her illness and that irreparable harm may result from a failure to appoint an emergency guardian of her person *with limited powers,* Gloria A. Anderson is appointed emergency guardian of the person of Cheryl I. Dyarman, for a period of 72 hours, with a right to move for an extension of up to 30 days, for the limited purpose of authorizing hospitalization for treatment of physical illness or condition, intravenous therapy (including administration of nutrients, fluids and medication by vein), antibiotics and pain medications, but with-

out power to authorize those procedures proscribed in Ms. Dyarman's living will and without power to authorize ECT treatments, pending further order of court.

"The guardian is further requested to take such steps as she deems appropriate to see that Ms. Dyarman is as comfortable as possible and to facilitate visits from persons concerned for her welfare, such as members of the clergy, who might be able to alleviate her suffering."[3]

A motion for reconsideration, objecting to the court's refusal to commit Ms. Dyarman to a mental institution for involuntary treatment and its refusal to authorize the guardian to subject her to electroconvulsive therapy, was filed on February 6, 2001. In response to the motion, a court en banc, comprised of President Judge George E. Hoffer, Judge Edgar B. Bayley, and the undersigned judge, was convened. Argument on the motion for reconsideration was heard by the court en banc on Wednesday, February 7, 2001.

Following the argument, the court en banc declined to modify the prior orders.[4] On February 9, 2001, a petition for the application of extraordinary jurisdiction pursuant to 42 Pa.C.S. §726 was filed with the Pennsylvania Supreme Court by Mr. O'Brien. The petition basically requested the relief which had been sought in this court, and indicated that the guardian was not willing to exercise the limited protective powers on behalf of Ms. Dyarman that had been authorized, and that she had re-

---

3. Order of court, February 2, 2001. (emphasis added)

4. Order of court, February 7, 2001.

fused to seek an extension of those powers as permitted by the order and by law.[5]

## STATEMENT OF FACTS

Cheryl I. Dyarman is a 52-year-old woman who resides, and is cared for, at the Cumberland County Nursing Home. She was admitted to the nursing home in 1987.

From an early age, Ms. Dyarman has suffered from an irreversible, progressive illness from which she will not recover, known as demyelinating disease. In anticipation of the progress of the disease, she executed a living will in 1995, containing the terms recited in the order of court quoted above.

The illness has now progressed to the point that Ms. Dyarman is totally paralyzed with the exception of an ability to move her head somewhat from side to side and to speak, unclearly and with great difficulty. She can also cry or wail when acutely distressed.

She is totally unable to assist herself with respect to bodily functions and needs, including eating or drinking. She is totally dependent upon others for her physical care.

Ms. Dyarman's husband left her. She has no children or close relatives. In the past, some relief from her suffering was provided by her mother, whom she loved very much, by a gentleman from the Gideon Bible Society who visited her, and by weekly hair treatments. Her mother died in April 2000, the gentleman from the

---

5. See Act of June 30, 1972, P.L. 508, §2, as amended, 20 Pa.C.S. §5513 (2000 Supp.).

Gideon Bible Society retired due to his own advancing age, and the weekly hair treatments no longer interest her.

Ms. Dyarman is severely depressed. At one point in the hearing, Mr. O'Brien requested silence so that those present could hear what Ms. Dyarman was wailing. She was wailing, with great difficulty, "I want to die."

Mood elevators administered to her in the past have gradually ceased to be effective. For a number of months she has declined to accept such medication, and she has become increasingly resistant to efforts to convince her to swallow food. Her weight has decreased dramatically.

A psychiatrist from Franklin County who consults with the nursing home and who is familiar with Ms. Dyarman is of the view that electroshock therapy would be the treatment of choice at this point for her depression, since medication has lost its efficacy. Such treatment would be inpatient and would consist of a series of electroconvulsive sessions over a two-week period. The electric current would alter the chemistry of her brain, and might erase some of her memory. The treatment would in no way alter the relentless course of her physical illness.

The first day of hearing in these cases was held at the nursing home, in Ms. Dyarman's room, by the undersigned judge. The court observed Ms. Dyarman, and her indescribably difficult circumstances, and was firmly of the view that she understood what was transpiring, that she did not want to undergo electroconvulsive therapy, that her despair was a rational response to an intolerable situation, and that her unwillingness to accept food presented to her mouth was borne of a natural

reluctance to extend the duration of her physical deterioration.

The court did not believe that Ms. Dyarman was mentally ill in the sense that her depression was inspired by forces other than her actual condition or that it was more than the normal reaction of any sentient person to the condition she was in. The court felt that she had been brave for a long time.[6]

Following the hearing on the second day, the court entered the orders related above, denying the request for commitment of Ms. Dyarman to a mental institution for involuntary treatment and appointing an emergency guardian in the person of Gloria A. Anderson[7] to facilitate medical treatment, including intravenous medication and nutrients, in accordance with Ms. Dyarman's living will, but not authorizing her subjection to electroconvulsive therapy in the absence of further order of court.

As noted, a court en banc, following argument, declined to modify these orders. Mr. O'Brien thereafter filed the petition for exercise of extraordinary jurisdiction by the Pennsylvania Supreme Court mentioned above, indicating the guardian's refusal to exercise the powers which had been granted to her under the court's order and her refusal to request an extension of those powers.

---

6. In this regard, it is interesting to note that another recent attempt to have Ms. Dyarman committed to a mental institution, by way of a petition for emergency involuntary treatment under section 302 of the Mental Health Procedures Act, failed when an examining physician at the Carlisle Hospital refused to approve the commitment.

7. See note 2 *supra.*

## DISCUSSION

A fundamental principle in a case of this type was expressed more than a century ago by the United States Supreme Court in *Union Pacific Railway Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734, 737 (1891).

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person . . . ."

This principle, which embodies the right to refuse medical treatment, "has deep roots in our common law" and is recognized in Pennsylvania. *In re Fiori,* 543 Pa. 592, 600, 673 A.2d 905, 908 (1996). The right is not, of course, absolute.

Under the Mental Health Procedures Act, a person who is mentally ill[8] to a degree describable as severely mentally disabled[9] and who is in need of treatment may

---

8. Mental illness is not specifically defined under the Mental Health Procedures Act. Oler, Pennsylvania Criminal Law: Defendant's Mental State, §4.4 at 58 n.32 (Michie Co. 1986); but see 55 Pa. Code §5100.2.

9. The Mental Health Procedures Act defines severe mental disability in the following terms:

"A person is severely mentally·disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself." Act of July 9, 1976, P.L. 817, §301(a), as amended, 50 P.S. §7301(a) (2000 Supp.).

The existence of a clear and present danger of harm to others or oneself is generally dependent upon the occurrence within the immediately previous 30 days of certain acts by the subject: the infliction or attempted infliction of serious bodily harm upon another, conduct evi-

be subjected to involuntary examination and treatment[10] at certain institutions.[11] However, the burden of proof upon a petitioner in such a case is "clear and convincing evidence." Act of July 9, 1976, P.L. 817, §304(f), as amended, 50 P.S. §7304(f) (2000 Supp.). Clear and convincing evidence is the highest burden in the civil law.[12] In addition, the opinion of an expert, while entitled to consideration, is not binding upon the court as trier-of-fact, even if uncontradicted.[13]

Under the Probate, Estates and Fiduciaries Code, a guardian of the person may be appointed for a person who is incapacitated within the meaning of the act.[14] For purposes of a guardian of the person, an incapacitated person is "an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable . . . to meet essential requirements for his physical health and safety."[15] An

---

dencing self-neglect reasonably likely to have serious consequences within 30 days, attempted suicide and the reasonable likelihood of repetition, or attempted or actual self-mutilation of a substantial nature and the reasonable likelihood of repetition. Act of July 9, 1976, P.L. 817, §301(b), as amended, 50 P.S. §7301(b) (2000 Supp.).

10. Act of July 9, 1976, P.L. 817, §301(a), as amended, 50 P.S. §7301(a) (2000 Supp.); *id.,* §304(a), as amended, §7304(a) (2000 Supp.).

11. Act of July 9, 1976, P.L. 817, §105, as amended, 50 P.S. §7105 (2000 Supp.).

12. *Spaw v. Springer,* 715 A.2d 1188 (Pa. Super. 1998).

13. See *Moriens v. Albert Einstein Hospital,* 363 Pa. Super. 557, 561, 526 A.2d 1203, 1205 (1987).

14. Act of April 16, 1992, P.L. 108, §9, 20 Pa.C.S. §5512.1 (2000 Supp.).

15. Act of April 16, 1992, P.L. 108, §6, 20 Pa.C.S. §5501 (2000 Supp.).

emergency appointment for 72 hours, subject to an extension, is provided for in the Act.[16]

However, several statutory factors militate in favor of an exercise of this authority by a court with a degree of restraint. First, one goal of the act is to permit "incapacitated persons to participate as fully as possible in all decisions which affect them . . . ." Act of April 16, 1992, P.L. 108, §7, 20 Pa.C.S. §5505 (2000 Supp.). Second, a guardianship of the person is to be "limited" in scope, as opposed to "plenary" in scope, in the absence of a finding that the person is "totally incapacitated." Act of April 16, 1992, P.L. 108, §9, 20 Pa.C.S. §5512.2 (2000 Supp.). Third, *electroconvulsive therapy is expressly excluded from the powers of a guardian of the person in the absence of a specific finding and order of the court to the contrary.* Act of April 16, 1992, P.L. 108, §8(d), 20 Pa.C.S. §5521(d) (2000 Supp.).

Fourth, the right of individuals "to control decisions relating to their own medical care" has been recognized in sections of the Code providing for living wills. Act of April 16, 1992, P.L. 108, §5, 20 Pa.C.S. §5401-16. Finally, the burden of proof upon a petitioner in an incapacity case is "clear and convincing evidence," the highest burden in civil law. Act of April 16, 1992, P.L. 108, §8(a), 20 Pa.C.S. §5511(a).

In the present case, the court did not feel that petitioners had shown by clear and convincing evidence that Cheryl I. Dyarman was subject to involuntary treatment under the Mental Health Procedures Act, nor to the appointment of a guardian of her person with the ex-

---

16. Act of April 16, 1992, P.L. 108, §10, 20 Pa.C.S. §5513 (2000 Supp.).

traordinary power to authorize her subjection to electroconvulsive treatments with a view toward altering her mental attitude as it related to a hopeless and progressively debilitating physical illness that had reached the point of almost total paralysis. She had committed no crime which might be said to have warranted a forfeiture of her basic rights.[17] A guardian of her person was therefore appointed with powers to carry out the wishes which she had expressed at a better time in her life.

While the court has no question as to the sincerity of the belief that the relief requested in the petitions herein would promote the welfare of Ms. Dyarman, it is also mindful of the observation of Benjamin Franklin more than two centuries ago:

"To bear other people's afflictions, every one has courage and enough to spare." [18]

---

17. Cf. *Commonwealth, Department of Public Welfare v. Kallinger,* 134 Pa. Commw. 415, 580 A.2d 887 (1990) (state prisoner may be force-fed).

18. Ben Franklin's Wit and Wisdom, at 22 (Peter Pauper Press).